CAUSE NO: 0917-00184-CV

# IN THE
# NINTH COURT OF APPEALS
# AT BEAUMONT

TASHA ROSE MARSH

Plaintiff-Appellant

v.

ROBERT CHRISTOPHER MARSH

Defendant-Appellee



FILED

DEC 11 2017

CAROL ANNE HARLEY
CLERK OF THE COURT
NINTH COURT OF APPEALS

## ON APPEAL FROM THE 258TH DISTRICT COURT
## THE HONORABLE JUDGE ERNEST MCCLENDON, PRESIDING

## APPELLANT'S REPLY BRIEF

PRO SE LITIGANT
Tasha Rose Marsh
151 Country Wood Drive
Shepherd, TX 77371
Telephone: (281) 419-7100

Oral Argument Requested

# IDENTITY OF PARTIES AND COUNSEL

Pursuant to Texas Rule of Appellate Procedure 38.1(a), Appellant presents the following list of all parties and names and addresses of its counsel:

NO. DV13,774

**Appellant/Plaintiff:**                    **Counsel:**
Tasha Rose Marsh                            Tasha Rose Marsh
                                            151 Country Wood Drive
                                            Shepherd, Texas 77371
                                            Telephone: (281) 419-7100

**Respondent:**
The Honorable Judge Ernest McClendon
258th Judicial District Court
San Jacinto Court Building
1 State Hwy 150
Coldspring, Texas 77331

**Appellee/Defendant:**                     **Counsel:**
Robert Christopher Marsh                     Seth Evans
                                            507 N. Washington Ave.
                                            Livingston, TX 77351
                                            Telephone: (936) 327-0232

AND IN THE INTEREST OF:

A.M.M., S.J.M., S.W.M., A.R.M., H.S.M., J.S.A.M., AND E.L.B.M., CHILDREN

3

# INDEX OF AUTHORITIES

**Statutes**

Tex. Fam. Code §6.305(a)(1)(2)................................................5, 8

Tex. Fam. Code §153.001(a)(1)(2)(3)...........................12, 13, 14, 15, 18

Tex. Fam. Code §153.002 ...........................................12, 13, 15

Tex. Fam. Code §153.134(b)(1)(A)...................................... 14

Tex. Fam. Code §153.192(A)............................................. 14

4

# TABLE OF CONTENTS

IDENTITY OF PARTIES AND COUNSEL                          2

INDEX OF AUTHORITIES                                     3

TABLE OF CONTENTS                                        4

STATEMENT OF THE CASE                                    5

STATEMENT REGARDING ORAL ARGUMENT                        6

INTRODUCTION                                             7

LEGAL ARGUMENT                                          12

    I. INDISCRETION                                     12

    II. FALSE ALLEGATIONS                               18

    III. DE NOVO REVIEW                                 19

CONCLUSION                                             22

CERTIFICATE OF COMPLIANCE                              24

CERTIFICATE OF SERVICE                                 24

# STATEMENT OF THE CASE

Utilizing Texas' Long-Arm Jurisdiction (Tex. Fam. Code §6.305(a)(1), (2)), Appellant Tasha Rose Marsh brought a civil divorce action against Appellee, Robert Christopher Marsh, after he fled the state of Texas with the couple's seven children for his parents' home in Florida. Robert Christopher Marsh counter-sued after a mediation process in which couple attempted to reconcile the marriage. Robert Christopher Marsh was awarded right to determine residency of children and returned with them to his parents' home in Florida.

Respondent:　　　　　　　　　　　　　　The Honorable Judge Ernest McClendon, 258th Judicial District Court,

San Jacinto County, Texas.

Respondent's Action:　　　　　　　　　　April 26, 2017, the trial court entered final judgment allowing appellee, Robert Christopher Marsh primary managing conservatorship with joint custody, but with the right to determine residency without geographic restriction.

6

# STATEMENT REGARDING ORAL ARGUMENT

Pursuant to TRAP RULE 38.1(e) Appellant included a request for Oral Argument and in her initial Brief and in compliance with TRAP RULE 39.7 that request was made on the front cover of her Brief.

# INTRODUCTION

The continued purpose of this Appeal is to demonstrate how rulings by the Honorable Judge Ernest McClendon at the 258th Judicial District Court with regard to conservatorship and visitation of Appellant Tasha Rose Marsh's seven children were made without respect to law and factual evidence and therefore constitutes and warrants a *de novo* review and reversal.

During the Lower Court proceedings, Mrs. Marsh—a loving mother who sacrificed her career, energy, college, and eighteen years of her life to bear, raise, and homeschool seven children and serve as a dutiful housewife—was railroaded by a sustained, multifaceted campaign of character destruction not just by her husband but by his family as well. In capsule:

- She was railroaded by false allegations of child abuse by Appellee, a vindictive husband working in concert with the couple's two rebellious teenagers, A.M.M. and S.W.M., to marginalize and belittle Mrs. Marsh and create an environment of open disobedience that reached critical mass when Appellant's two teenagers physically attacked her. Appellee orchestrated this event by encouraging the two teens to freely defy their mother and he utilized it as the lynchpin in influencing the Lower Court's ruling. Appellee told police officers his wife was "attacking the children" when in reality she merely disciplined them for striking her, twisting her arm, and stealing her cell phone and threatening to drop it in a toilet. After two officers arrived, they assessed the situation and spoke with the couple and their two teenagers and found no wrongdoing. Appellee was told specifically to stop undermining his wife's authority and let her discipline her children. This was not Appellee's anticipated outcome and

therefore he called a third police officer to the residence the following morning. Appellee was clearly not seeking justice, he was seeking a result in his favor.

- She was railroaded economically when Appellee unexpectedly stole away with the couple's seven children to his parents' home 1000 miles away leaving her penniless, under a mountain of mortgage debt, and having to ask for money from her church family and father to retain legal counsel and use Texas' "long arm statute" (Tex. Fam. Code §6.305(a)(1), (2)) to force him to return her children to Texas.

- She was railroaded by Appellee's family who played an active, hostile role in the divorce proceedings, in particular Appellee's father, who testified against Mrs. Marsh's character in court even though the in-laws lived across the country and had less than peripheral involvement or knowledge about Appellee/Appellant's relationship other than what Appellee told him. Appellee's aunt played a similar role, acting as his legal counsel and encouraging separate false allegations made against Mrs. Marsh—allegations rejected in Florida court. Appellee's family were making a flagrant, undisguised play for her children. Mrs. Marsh was not involved in a divorce with Appellee, but effectively his entire family, who put their resources and witness testimony at the service of co-opting her children.

As this Appeal will demonstrate, all of the above combined to create a perfect legal storm whereby Mrs. Marsh lost all seven of her children through the indiscretions of a Lower Court Judge who, although ostensibly well-meaning, executed his duties in what must be the very definition of *arbitrary and unreasonable* with respect to the statues and traditions of Texas Law. Judge McClendon allowed two rebellious teenagers, one of which he found "very, very angry" (R.R. p. 167) and "definitely" thought "needs counseling"—which he in fact ordered for the two teenagers (R.R. p. 167)—to effectively run the legal show in what cost Appellant all of her children resulting in their removal by Appellee to a distance

9

equivalent to that of London to Rome. Furthermore, Judge McClendon ruled that Mrs. Marsh should have less-than-standard visitation, as if it were an example of impartial and reasonable adjudication, much less realistic, for a mother of seven to drive 2000 miles round-trip to get her children once monthly for weekend visitation, standard or not.

In his rebuttal, Appellee sustains this campaign of character destruction, a mixed bag of open and covert methods including raising false accusations, planting rumors, and manipulating information. At one point, Appellee plays judge and jury by pronouncing Mrs. Marsh guilty as charged for "felony injury to a child" (p. 3), a false allegation made by Appellee and later no-billed by a Grand Jury. Appellee banishes the presumption of innocence by stating Mrs. Marsh "was arrested for felony injury to a child on October 25, 2016." Not *alleged* felony injury to a child... 6th Amendment to the U.S. Constitution and a fair and speedy trial be damned. That the record for this serious charge—the lynchpin of Appellee's case and the Lower Court's ruling—is set straight later in his rebuttal (p.14) is a moot point as the table has been set. Opening his rebuttal by insinuating Mrs. Marsh is a felon guilty as charged of child abuse should serve to cast a stark light on the methods of character assassination utilized against Appellant in the Lower Court proceedings and continue to be tactically employed as the case finds itself before the Court of Appeals. Even as Appellee suddenly discovers the word "allegations" (p. 14), one page later Mrs. Marsh is back at the mercy of frontier justice as he states "even if the evidence of Appellant's abuse was not supposed to be taken into consideration" (p. 15). What abuse? The so-called "abuse" Appellee found at the end of the magic rainbow long before Mrs. Marsh had her day in court and was found innocent of the *alleged* abuse manufactured and foisted upon her by the Appellee? If this disingenuous half-truth and wordplay cannot pass freshman journalistic standards, what place has it in a court of law other than to undermine the truth?

It is difficult to separate Appellee's legal arguments from the ad hominem attacks woven into his rebuttal. Appellee states that after 18 years of marriage, seven children and

10

five miscarriages, 17 years of childrearing, homeschooling and being a housewife, Mrs. Marsh suddenly has "a pattern and history of bad behavior and poor parenting" (p.6). She has suddenly become "violent towards Appellee and the parties' children" and then "been arrested" (p.2). In addition to being "abusive" to all in the household, Appellee states "she was difficult to live with" and "the children wanted nothing to do with her" (p. 12). In fact, she flat out puts "the children in emotional and physical danger" (p. 20) and their house, which Appellee had occupied for half-a-decade and only recently left, is now "infested with fleas" and has "water leaks." Appellee does everything but invoke the Spanish Inquisition and designate their family home of half a decade the Amityville Horror. Comically, Appellee drafted his *"J'accuse...!"* rebuttal the very moment Mrs. Marsh—heretofore the child-beating felon jailbird according to Appellee—had possession of their four youngest children for the recent 2017 Thanksgiving holiday at the behest of the Appellee and at the very house he smears as a flea-bitten, water leaking house of abuse and horror!  It should also be noted that this past summer Appellee let the same youngest four children spend two months of summertime vacation with their mother at the same house "infested with fleas" and "water leaks" and with this very same mother whom Appellee condemns as an "emotional and physical danger" to the children.

If being characterized as an "emotional and physical danger" to her children (who Appellee happily turns over for months) is not enough, Mrs. Marsh is furthermore vilified as inept. Although she has homeschooled their seven children for seventeen years, Appellee is now worried because, as he puts it, she has "no specific degrees or experience other than what she had done with the children in the past" (p. 11). In fact, she plainly just does "not do a good job of being a hands on parent" and "the children often had to fend for themselves when in her care" (p.12). Mea culpa! Somehow all of Mrs. Marsh's children learned to read while in "in her care" and were never held behind for the better part of twenty years during Mrs. Marsh's homeschooling of them. In fact, they excelled under her

tutelage. Yet the portrait Appellee paints for the Court is one of *Les Misérables* street urchins at the mercy of passers-by; guttersnipes eating green onions growing in the yard while their mother tells them to eat cake and has her nails done. What Appellee fails to mention is that he is a work-from-home house-husband, so the children were never simply "in her care" nor "had to fend for themselves," they were in fact in *his care* as well, 24x7, year after year.

Finally, Appellee plays the last character assassinating card in his brief: Mrs. Marsh, the "violent" "abusive" "difficult to live with" cheating guilty-until-proven-innocent felon with "a pattern and history of bad behavior and poor parenting" who puts "the children in emotional and physical danger" in her flea-infested water-leaking house.... Mrs. Marsh plainly just does not care about getting her children because "Appellant did not file her Petition for Divorce seeking custody of the parties' children until February 9, 2016 approximately three months after the parties separated and Appellee moved with the children to Florida" (p. 2). The reason for this is because Appellee, the parties' sole breadwinner for 18 years, abandoned her and left her penniless with their $1250/month mortgaged property, utility and credit card bills, and a broken down car. Mrs. Marsh, who had only spent her entire adult life raising and schooling their children, possessing no other skill set than those of "mother" and "housewife," had to go out and look for work, lean on the goodwill of her church to help keep the lights on, and it took those months to financially obtain the funds to secure legal counsel to file for Divorce. Appellee's rebuttal is a virtual North Korea loaded with Weapons of Mass *Distraction*.

The matter at hand is to reexamine the court ruling for indiscretion with respect to the Lower Court, not to sling mud nor plumb the symptoms of a marriage in a downward spiral, actions Appellant believes obscure and detract from the facts and law needed to resolve the Appeal at hand. It is less the concern of Mrs. Marsh that Appellee intentionally inserted these emotionally sensational, denigrating characterizations and half-truths for this

purpose, more her belief that the issues in the Appeal are better served by putting on a business face and not war paint. To wit: Did the Honorable Judge Ernest McClendon reversibly err in seizing all seven of her children and giving full residential custodial powers to Appellee without regard to geographic restriction? Did Judge McClendon make a snap decision based on emotion and/or insufficient evidence that qualifies as arbitrary and unreasonable with respect to Texas' statues, legal traditions, and the opinion of the Ninth Circuit Court of Appeals?

# LEGAL ARGUMENT

I. THE DISTRICT COURT EXHIBITED ARBITRARY AND IRRATIONAL INDISCRETION BY GRANTING APPELLEE RESIDENTIAL CUSTODY WITHOUT GEOGRAPHIC RESTRICTION AND ALLOWING CHILDREN TO BE REMOVED TO FLORIDA

On the issue of the children being removed from their mother 1000 miles away to Florida, a ruling completely at odds with any sober interpretation of co-parenting with respect to Tex. Fam. Code §153.001(a)(1)(2) and best interest of the child under Tex. Fam. Code §153.002, Appellee concedes he gave the Trial Court "conflicting evidence" (p. 11) and on this point Appellant agrees. Appellee admitted to the Trial Court he works from home over the Internet (R.R. p. 67) and can do so from anywhere with an Internet connection. Ergo, Appellee's desire to remove the children from their mother across the country was in no way influenced by better job opportunity, pay, or the advancement of his career. For years Appellee stayed at home to work rather than commuting into the nearby fourth-largest city in the United States, Houston, and thriving in a department or business unit as part of a team or management. Appellee had aspirations to be a comic book artist and this stay-at-home, telecommuting house-husband arrangement was conducive to this

pursuit. Appellee could move to Canada, Florida, Zimbabwe or choose to stay in Texas, in no way would his work situation change or be impacted. In fact, Appellee TWICE admitted to the Trial Court that the children's homeschooling regime in Florida was "identical" (R.R. p.89) to the programs that the children were previously doing in Texas with their mother. So what underlying motive would Appellee have to remove the seven children a thousand miles away from their home and mother—the distance from London to Rome—which of his own admission in no way advanced his career or financial standing nor the children's education, which he twice admitted was "identical" to that provided by Mrs. Marsh? A: It was less a run to Florida, more a run into the arms of his enabling mother and father, which Appellee admits was the driving reason (R.R. p. 69) for his desire to abandon his home and property and wife in Texas where he had set down roots for years with his Mrs. Marsh and their seven children. It should also be noted that just prior to the divorce proceedings Appellee declared bankruptcy (Case Number 15-32593, Southern District of Houston Division, Judge Karen Brown presiding) after years of mismanaging his finances and spending beyond his means. One may logically construe this as a bankrupt middle-aged father of seven fleeing his wife and mortgaged property to live in his parents' basement under the pinions of their wings. However, Appellee's bankruptcy only *facilitates* his ability to keep the children in their home state, not hinder it. By abandoning his creditors and financial obligations, Appellee had no pressing need for his parents' financial and residential resources, a key point to consider in the Lower Court's conservatorship decision with regard to Tex. Fam. Code §153.001(a) 1-3 and §153.002. When Appellee admits he wants the Court to give him "the authority to move the children to Florida" so that he could "have help" from his parents (R.R. p. 69), what "help" does he specifically mean? Appellee wiped his debt slate clean! Homeschooling the children? He believes that is "identical" to what Mrs. Marsh provided the children. Work? He can theoretically do his job from a Starbuck's with Wi-Fi in Katmandu.

14

More telling than Appellee's strange call for help a thousand miles away however, is Appellee's view on co-parenting. When pressed on this matter with a hypothetical situation where either Appellant or Appellee could move the children across the country (R.R. p.71), he hedges with contradictory albeit self-serving responses:

*"COUNSEL: But either way, if you live in Florida, either she has to move. If she moved to Wisconsin, you would have to move; is that correct?*

*APPELLEE: Yes.*

*COUNSEL: So the only way that y'all could effectively actually be co-parents is for the Court to require y'all to be in one location?*

*APPELLEE: I would say no."*

This disingenuous and seemingly-confused response by Appellee is exemplary of the "conflicting evidence" he concedes in his rebuttal he gave the Trial Court. Appellee must twist himself to pay lip service to Texas' co-parenting Public Policy in Tex. Fam. Code §153.001(a)(1)(3), but catch and correct himself in a Tour de France of backpedaling when that policy conflicts with his aims to move the children four states away. Appellee believes the winning residential custodian should have the power to move cross-country and the loser should move accordingly—in the best interest of co-parenting of course!—but any ruling geographically restricting him and the seven children to their home state of Texas, and concomitantly their mother, is somehow not conducive to co-parenting! Texas courts routinely geographically restrict parents (Tex. Fam. Code §153.134(b)(1)(A)) and even parents appointed possessory conservator may be geographically restricted (Tex. Fam. Code §153.192(A) *"Unless limited by court order..."*). Appellee clearly has no interest in co-parenting in the slightest. His goal is trading in the children's mother for his parents and preempting her altogether. In effect, he is saying: *Yes I will move to Wisconsin in the interest of co-parenting if she wins, no I don't think I should be restricted to the state they*

15

were raised in for the past seventeen years so they can be near their mother if I win. It is the cross-examination equivalent of "Do as I say not as I do."

Contrary to Appellee's accusation that "there was sufficient evidence in the record to support the position that Appellant was not a parent that had shown the ability to act in the best interests of the children" (p. 13), no one individual has shown more personal sacrifice than Mrs. Marsh in devoting her entire life as a mother to "act in the best interest of the child" (Tex. Fam. Code §153.002)—seven children to be exact—for the past seventeen years! She bore them, breast fed all seven, taught them to read, and has shown the utmost selfless care toward training their faith in God, nutritional health, emotional health, education, and well-being. The Lower Court did not just arbitrarily show indiscretion in its application of Tex. Fam. Code §153.001(a)(1)(3), its legal public policy obligation to "assure that children will have frequent and continuing contact with parents" and "encourage parents to share in the rights and duties of raising their child after the parents have separated or dissolved their marriage." By allowing Appellee the sole power to relocate the couple's seven children 1000 miles away from their mother simply to be close to now-doting grandparents whose role for the last seventeen years regarding the children has been tangential at best, the Lower Court obliterated Tex. Fam. Code §153.001(a)(1)(3). It should be noted that Judge McClendon did not just reversibly err with respect to Texas statutes and guiding principles in an unreasonable and arbitrary manner, Judge McClendon did so while throwing impartiality to the wind. While making a snap decision on residential custody during his interview of the teenagers he went on to characterize as emotionally unbalanced (R.R. p. 167) and "angry, very angry," Judge McClendon regrettably apprises Mrs. Marsh's teenagers of this information in a decidedly unprofessional manner (R.R. p. 147):

*"THE COURT: And, of course, y'all both indicated y'all love Florida, too. So I just want to know if y'all have a spare bedroom where I can come down there during the summer."*

What place this whimsical, personal statement has in a Trial Court proceeding by a Magistrate removing seven children from their mother of seventeen years based upon the statements of two rebellious teenagers is confounding. After Judge McClendon is told by one daughter, S.J.M., "It's nice. You should" he closes with "I wish I could. Well, look, I'm going to rule for your dad to have custody of y'all." (R.R. p. 147). Does Judge McClendon also long to see Disney World during his imaginary summer stay in his "spare bedroom" in Florida with Mrs. Marsh's children? Unfortunately however, this is the SECOND TIME in the Court Record that Judge McClendon has expressed his wishes for this. The first occurs in the earlier interview with Mrs. Marsh's son, S.W.M. (R.R. p. 144):

*"THE COURT: Do you like living down there in Florida?*

*S.W.M.: Yes, sir.*

*THE COURT: Is the weather down there real nice?*

*S.W.M.: Yeah, usually.*

*THE COURT: Do you have a spare room, then? I might come down there."*

One can fathom Judge McClendon, a septuagenarian, being partial to Florida—a Mecca for elderly retirees, 'God's Waiting Room' so to speak. One can comprehend Judge McClendon being biased to the children's grandparents, who are in fact elderly retirees, to their mother of seventeen years' expense. In his brief interview with the teenagers the only substantive detail given about either grandparent is that the grandmother "makes the best spaghetti" (R.R. p. 137). Should Mrs. Marsh and her former mother-in-law have a cook-off to see whose spaghetti wins residential custody? In all seriousness, did the Lower Court consider how many of the seven children's dirty diapers Appellant has changed versus her mother-in-law? One can understand the partiality, but one cannot define a Lower Court

judge, or any judge, pining for a "spare bedroom" in Florida with two rebellious teenagers craving to run away from their legitimately disciplining mother as reasoning, impartial, and exemplifying judicial discretion. These capricious statements belie Appellee's assertions that the Lower Court did not act arbitrarily. What could be *more* arbitrary?

In capsule: after filing Chapter 7 bankruptcy, Appellee stole away with the couple's children in the night to his parents' home requiring Mrs. Marsh to file for divorce and force him back. During the Lower Court proceedings, what were Appellee's good faith reasons for wanting to move the children 1000 miles away? Work opportunity? No. Better pay? No. Children's education? He twice admitted that their homeschooling was "identical" to what their mother provided for them. Texas statutes and the guiding rules and decisions function to encourage the parties to live close to one another to best facilitate the opportunity for the parents to "co-parent" with one another and to lessen the transportation burden on both parties. Appellee had discarded his debt and ditched his creditors via Title 11 of the United States Bankruptcy Code. As part of the Divorce Settlement he signed over the couple's house and property to Mrs. Marsh, making her responsible for the $114,000 mortgage and property taxes, effectively papering over the last of his financial obligations. Appellee, debt free and still working the same online job workable from anywhere with an Internet connection, had absolutely no compelling, substantive reason for requesting the Lower Court to grant him full residential custody of the children without regard to geographic restriction. For its part, the Lower Court based its decision on a brief exchange with the two teenagers who had attacked Mrs. Marsh for disciplining them, two teenagers for whom the move to Florida was merely a Golden Ticket to run away from their mother. During their interview the Lower Court absurdly hears grandmother's spaghetti and nice weather as among its reasons to strip Mrs. Marsh of her seven children. The fractious teenagers, Judge McClendon tells Mrs. Marsh afterwards, "like the weather" (R.R. p. 158), they "like living with their grandfather and their grandmother" and that "I don't have any problem, you

know, finding that the father should be the managing conservator and that you should have the minimum amount of visitation." If this is not arbitrariness, if this is not an unreasonable example of indiscretion in the eyes of Texas jurisprudence, then Appellant begs to know: what is?

Geographic restrictions are a common occurrence in Texas divorce proceedings. Does "beautiful weather" and grandma's "great spaghetti" and an elderly judge's waking daydreams of a "spare bedroom" next to minors in Florida abrogate the rights of Texas mothers and fathers with regard to the Parent-Child Relationship in Texas Family Code Section 153.001(a)(1)(2)? Appellant beseeches the Higher Court: Reverse and remand.

II. THE DISTRICT COURT ERRED BY CONSIDERING UNFOUNDED, UNPROVEN, AND ULTIMATELY FABRICATED ALLEGATIONS OF CHILD ABUSE AGAINST APPELLANT

In his rebuttal Appellee states that the Appellate Court "may reverse the trial court's decision only if it is arbitrary and unreasonable" and "may set aside a verdict only if the evidence supporting it is so contrary to the overwhelming weight of the evidence as to be clearly wrong or manifestly unjust" (p. 8). Appellant completely agrees. In the case of the false child abuse allegations leveled against Mrs. Marsh, which hung over the Trial Court like an ominous black cloud, it was not the nature of the evidence but rather the seriousness of the charge that prejudiced the Lower Court against Mrs. Marsh and unjustly impacted the proceedings.

Contrary to assertions made by Appellee, there was no "significant evidence" that Mrs. Marsh "had been abusive to the children (p. 12)." Mrs. Marsh was NOT and is NOT an abusive mother.  Exactly which children, what abuse, and the nature of any evidence Appellee never bothers to mention in his rebuttal, he merely parenthetically tacks on some page references to the divorce transcripts to the effect of *Mrs. Marsh was "abusive to the children," go see for yourself.* What we are led to is testimony from the Appellee himself

19

during their bitterly contested custody dispute that the couples' 17-year old daughter, at that point ensconced in Florida with her siblings, was "physically violent," "throwing up," and "spending the evenings crying" having "nightmares" at the thought of seeing their mother for Christmas (R.R. p. 84). Their 14-year old son, Appellee states, was also "crying a lot." In fact, according to Appellee, all seven children were exhibiting "similar symptoms before the visit" (R.R. p.85). We are asked to believe that over a half-dozen children aged toddler to teenager—up until that point raised and homeschooled all their lives by their mother—were "exhibiting" "physically violent" Exorcist-like symptoms before a visit with her for the Christmas holidays. Ironically, or some might say *comically*, in spite of all of Appellee's portrayal of children vomiting, crying, dreading, and suffering nightmares about seeing Mrs. Marsh, five of Appellee's seven children loaded up and spent that Christmas with their mother in Texas. The focus now will be on the two teenagers who chose not to participate—Mrs. Marsh's eldest daughter, A.M.M., and her eldest son, S.W.M.—and how they were instructed by Appellee to openly disobey their mother, which they did to the extent of physically assaulting her, requiring Mrs. Marsh to discipline them, an event orchestrated by Appellee and used as manufactured, phony "evidence" of child abuse. This incident became the central gear turning all the other gears in Mrs. Marsh's divorce proceedings.

III. APPELLANT HAS STANDING FOR A DE NOVO REVIEW OF TRIAL COURT'S DECISION WITH REGARD TO MANAGING CONSERVATORSHIP

Appellee's brief is overloaded with cut-and-paste boilerplate essentially treating standards of review as meaningless save for buttressing his position that the Appellate Court is little more than a rubber stamp for the Trial Court (p. 8, 9, 10). However, it is the job of Appellate Courts to review Lower Court opinions and standards of review guide the Appellate Court in determining the level of error the Trial Court committed and whether that error should form the basis for reversal. Appellant believes that since the Trial Court

20

reached a legal conclusion based on uncontested flimsy and indeed confected "evidence" [READ: spurious allegations] of child abuse, the Appellate Court should review the Trial Court's decision *de novo*.

Due to the fast pace of the Trial Court proceedings, the amount of useful information the trial judge received was limited. Appellant's divorce trial focused on logistics, witness preparation, cross-examination of adverse witnesses, and numerous unanticipated questions of law and, of course, the interview of Mrs. Marsh's teenagers. Consequently, the Trial Court Judge ruled on those issues with neither extended reflection or extensive information. In contrast to the hurried schedule of the Trial Court Judge, Appellate Judges who review the Lower Court's factual findings *de novo* can focus more of their time to taking a "hard look" at those factual determinations. On the issue of conservatorship of Appellant's seven children, it is glaringly evident (R.R. p. 157-158) the Trial Court gave the overwhelmingly weight of its decision to statements made by the teenagers whom Appellant loves deeply, but concedes were alienated from her by Appellee:

*"THE COURT: Okay. The Court has had a visit with all three children individually and then I brought them in as a group. And in view of that, I think it's imperative that the father would be the managing conservator. And the older children have indicated they would like to have not much visitation. They don't feel like they need much visitation. And I don't think -- ma'am, I don't think they would even welcome any visitation. Now, the younger children, of course, I haven't talked to them, but I believe they are different. The older children have too many past memories of bad times. And for whatever reason, Mrs. Marsh, they do attribute those bad times to you and not to their father. So I don't have any problem, you know, finding that the father should be the managing conservator and that you should have the minimum amount of visitation, even so much so that maybe you should have visitation supervised."*

As exhaustively detailed in Appellant's original brief, two of these teenagers were involved in a physical altercation with their mother engineered by Appellee who openly told them to disobey their mother and ignore her authority. Appellee pounced upon this altercation to make claims of child abuse, accusations of which two responding police officers deemed false after having inspected and interviewed all parties and the children. Operating on advice from Florida, Appellee called police again the following day and the responding officer was more receptive and he arrested Mrs. Marsh. These charges were ultimately No Billed by a Grand Jury of San Jacinto County on May 19, 2017 and rejected by a unanimous jury on October 19th, 2017 after mere minutes of deliberation and after hearing a full day of testimony from the two teenagers and Appellee, who unraveled under cross-examination into a mess of conflicting testimony and—in the case of Appellee—did his cause no service with an embittered, imperious and condescending demeanor. The proverbial stake in Appellee's heart came when he defiantly told the Court he did not intervene when his children became physical with his wife after she seized their computers and in fact had earlier instructed them to do so. Appellee, who at the time of the altercation was staring at the very real possibility of Child Support orders for seven children and Maintenance to Appellant, also referred to the day Mrs. Marsh was arrested as "a very important day."

It took a Court and Jury in Coldspring an entire day of hearing testimony from the teenagers and Appellee to decide on a misdemeanor, it took Judge Ernest McClendon mere minutes with the same two teenagers to justify conservatorship of all of Appellant's children with full knowledge they would be taken 1000 miles away and effectively terminate the parent-child relationship with Mrs. Marsh and her children, including the four youngest who had absolutely nothing to do with the altercation involving her and her eldest son and daughter. Two rebellious teenagers' view of their mother fail to justify such a tragic outcome. When compared to the gravity of ending a parent-child relationship, reasons such

22

as grandma's spaghetti and the "beautiful weather" in Florida are trivial. Far, far more insidious is the fact that Appellee, on his own admission, had alienated the teenagers from Mrs. Marsh, instructing them to openly disregard her authority. This miscarriage of justice should not be papered over and explained away with arcane references to obscure cases such as those littered throughout Appellee's brief like so much glitter among the chicken feed; over a dozen citations including that classic of conservatorship determination, *Butnaru v. Ford Motor Co.* Every case before the Appellate is unique and it has been Appellant's stance in the spirit of this Appeal that this case requires no minute sifting through complicated facts or everything-and-the-kitchen-sink esoteric references to far-flung cases and decisions of a myriad of courts. The Appellate Court is not the sum of a handful of court cases, it is a living, working reality.

## CONCLUSION

The Lower Court was not familiar with the law or criminal proceedings. It lacked the experience and skill that can see the evidence behind the evidence. It was drowning in prejudice and acted according to what it admittedly saw as the credible desires of two "angry, very angry" fractious teenagers. Impressed, full of respect for these teenagers, it accorded too much importance to fragile allegations that were leveled against the accused for the purpose of removing all seven of her children 1000 miles away. For surely it might have been predicted with certainty that, if the Grand Jury's No Bill and the misdemeanor trial had taken place before the divorce proceedings, Mrs. Marsh would now be in possession of her children.

Whereas in the final analysis of the accusations against Mrs. Marsh nothing remains standing and setting aside the judgment of the Lower Court leaves nothing that can be

23

considered to be a crime or misdemeanor; therefore by applying the standard of review applicable to *de novo*, no reference to another court should be pronounced.

For the foregoing reasons, the judgment of the Trial Court should be reversed and the case remanded for *de novo* review of the Lower Court's decision. Appellant specifically and respectfully requests that Appellee, Robert Christopher Marsh, be immediately ordered to return with their seven children to Texas and be geographically restricted to the State and that Appellant Tasha Rose Marsh be named Managing Conservator of the four youngest children, A.R.M., H.S.M., J.S.A.M., and E.L.B.M.

Respectfully Submitted,

BY: /s/ Tasha Rose Marsh
151 Country Wood Drive
Shepherd, TX 77371
(281) 419-7100
tasharosemarsh@gmail.com

Tasha Rose Marsh
*Pro Se Appellant*
December 11, 2017

# CERTIFICATE OF COMPLIANCE

Pursuant to TRAP 9.4(i)(2)(C) the number or words in this computer generated Reply Brief does not exceed 7,500 words.

# CERTIFICATE OF SERVICE

As required by Texas Rule of Appellate Procedure 6.3 and 9.5(b), (d), (e), I, Tasha Rose Marsh, certify that I have served this APPELLANT'S REPLY BRIEF on all other parties which are listed below on December 11th, 2017 as follows:

Appellee: Robert Christopher Marsh
1226 South East Palm Beach Road
Port St. Lucie, FL 34952
Telephone (936) 217-5967

Seth Evans
Evans Law Firm
507 N. Washington Ave.
Livingston, TX 77351
Telephone: (936) 327-0232
FAX: (936) 327-0233

/s/ Tasha Rose Marsh [Signature of pro se party]

12/11/2017 [Date]

NOTES: Pursuant to Texas Rule of Appellate Procedure 6.3, a party=s lead counsel must be served.  Service on other attorneys for that party is optional, but must be listed above if they are served.  Pursuant to Texas Rule of Appellate Procedure 52.7(c), the record must be served on each party in an original proceeding.

Recipient Information:
To:   Carol Anne Harley
Fax#:   14098358497
Subject:

Sender Information:
From:   Tasha Rose Marsh (Pro Se Appellant)
Pages:   25
Date:   Dec 11, 2017

Comments:

Please find herein my Reply Brief for the Ninth Circuit Court of Appeals, CAUSE NO: 0917-00184-CV.
TASHA ROSE MARSH

# FAX COVER SHEET

**If you didn't receive this fax in your email you need:**



faxing simplified. anytime. anywhere.

Send and receive faxes through your email, online or smartphone.

No paper, ink, or 2nd phone line required.
Includes a real fax number!

**Try it free for 30 days at myfax.com**

MyFax® is an award-winning Internet fax service that requires no hardware or software. All you need is Internet access, a MyFax account, and an email address. There is no contract to sign, no setup fees, and you can cancel anytime. Try it FREE for 30 days – Keep it for only $10 per month

MyFax does not tolerate fraud and abuse. If this fax is spam, promotes illegal activity or is abusive, please email support@myfax.com. To have your fax number placed on a Do Not Fax list, please call 1-866-208-5903

This fax was delivered by MyFax Free a no cost, send only version of the MyFax Internet Fax service. For more "perfect for small business" online services visit www.j2.com